[No. 1685.]

### LARKIN REYNOLDS *v.* THE STATE.

1. CIRCUMSTANTIAL EVIDENCE.— CHARGE OF THE COURT to the effect that "you are further charged that the State in this case relies upon circumstantial evidence to establish the alleged fact that defendant and said A. J. Moore acted together as principals in the alleged taking of said hogs," etc., is not a charge upon the weight of evidence; it was, in view of the fact that the evidence referred was purely circumstantial, a proper introductory statement to a correct charge upon circumstantial evidence, and, being favorable to the accused, was a statement of which he cannot be heard to complain, especially in view of the fact that it was not specially excepted to at the time of the trial.

2. SAME.— See the statement of the case for a charge of the court upon circumstantial evidence *held* sufficient, in view of the fact that no exception to the same was taken at the proper time, and no special charge was requested.

3. SAME.— It is not error to refuse a special charge when the substance of it has been given in the general charge.

4. PRACTICE — PRIVILEGE OF COUNSEL.— The prosecuting counsel in his closing argument asserted that "this defendant and Moore, with whom he is charged as principal, stole the hogs and divided them." *Held*, that this statement was warranted by the evidence, and was within the rules governing arguments.

5. SAME — VERDICT.— Neither bad spelling nor bad grammar will vitiate a verdict when its meaning is clear.   Technical and unsubstantial objections to a verdict will not be considered in determining its sufficiency.   The omission of the letter "i," forming the second syllable of the word penitentiary, will not invalidate a verdict.

6. THEFT — FACT CASE.— See the statement of the case for evidence *held* sufficient to support a conviction for theft of hogs over the value of $20.

Appeal from the District Court of Bell. Tried below before the Hon. B. W. Rimes.

The indictment in this case was joint against the appellant and one A. J. Moore, and charged them with the theft of nine hogs, of the value of $25, the property of M. C. Parker, in Bell county, Texas, on or about the 3d day of March, 1884. The appellant being alone upon trial, he was convicted and his punishment was assessed at a term of two years in the penitentiary.

The charge of the court upon circumstantial evidence, which is the subject-matter of the second head-note of this report, reads as follows:

"You are further charged that the State in this case relies upon circumstantial evidence to establish the alleged fact that defendant and said A. J. Moore acted together as principals in the alleged taking of said hogs; and to establish that defendant and said A. J. Moore acted together as principals in taking said hogs, by circumstantial evidence, the facts and circumstances relied upon must exclude to a moral certainty every other reasonable hypothesis save and except that one that they did act together in taking said hogs. . . ."

M. C. Parker was the first witness for the State. He testified that he lived near Youngsport in Bell county, Texas, and knew both the defendant and A. J. Moore. Defendant lived about three miles distant from the witness, and Moore lived about a mile distant from the defendant. Witness was a farmer and owned some stock. On or about the 3d day of March, 1884, witness lost nine head of hogs. Those hogs customarily ran on the range about the place, and the witness had never known them to stray further than a mile from his house. The drove lost consisted of a boar, three sows and five pigs. Two of the sows were marked, the other animals were not. As soon as he missed his animals, the witness made diligent search for them throughout their range, and, acting on information, went to the defendant's pens, where he found all of his animals save two sows. Mr. F. A. Asherbrarner was with the witness when he went to defendant's pens and found his hogs. The sow, which was unmarked when lost, was in the fresh mark of the defendant, and so was the boar, which, when lost, was unmarked. These animals the witness had raised and knew to be his. Four of the five pigs found in the defendant's pens were pigs of the sow found in those pens, and the fifth pig was the pig of the sow the witness afterwards found in Moore's pen. The seven hogs found in the de-

fendant's pens belonged to the witness, and were taken from his possession in Bell county, Texas, on or about the 3d day of March, 1884, without the knowledge or consent of the witness.

From the defendant's pens the witness and Mr. Asherbrarner went to A. J. Moore's house and found another of his sows in Moore's pen. This sow, when lost, was marked, and when found was fresh marked, the fresh mark not entirely obliterating the witness's old mark. Witness did not consent for Moore or any one else to take that sow. She was a good sow, and worth $8 at that time. The boar found in the defendant's pen was worth $8, and the sow and pigs found in that pen were collectively worth $10. The sow found in the defendant's pens was a black and white spotted sow, part Poland-China, about eleven months old, very much reduced by the pigs, but of a weight exceeding one hundred pounds. The pigs were about six weeks old. The boar was a cross of Poland-China and Guinea, and was very valuable as a stock hog. In the two pens the witness found eight of the nine hogs he lost. One sow was not found. She was a large, fat animal, and in fine killing condition. She would have weighed over two hundred pounds, and at the prevailing price of pork, six cents, would have netted over $12.

After finding the hogs, and on the same evening, the witness went before A. H. Ray, justice of the peace for precinct number eight of Bell county, and sued out a writ of sequestration. Next morning, in company with Constable Cathay and Mr. Asherbrarner, witness went to the pens described and took possession of the hogs under his writ of sequestration. The constable also had warrants for the arrest of the defendant and Moore. Witness did not search Moore's house for fresh meat, but the constable did, and he will depose to what he found. Witness and his party first went to the defendant's pen and got the seven head of animals there confined. Thence they went to Moore's pen and got the sow confined therein. As soon as this sow was recovered, one of the pigs found with the bunch at defendant's pen left the bunch and ran to the sow taken from Moore, and suckled her. That pig has followed that sow ever since. That sow was that pig's mother, to the positive knowledge of the witness.

Neither the defendant nor Moore were at home when the hogs were taken from their respective pens, but were soon found together at the house of old man Moore, the father of A. J. Moore. When witness asked the defendant about the animals found in his pen, he said that he owned the sow and pigs, and that he had got them up

from the range, and marked the sow as he found her unmarked. He also said that he marked the boar in his mark, but did not claim the boar; that after he got the sow and pigs in the pen, the boar came around the pen, and as he was a "d—d fine hog, he just caught him, marked him and threw him in the pen." Moore said nothing at all in explanation of the presence of the sow in his pen. Defendant and Moore were then arrested and placed under bond to appear before the justice's court as an examining court, on a charge of theft, but they both left the evening before the said trial and their appearance bonds were forfeited. When court met, witness proved and recovered his hogs. The defendant did not appear to contest the right of property and has never since asserted title to the hogs. Defendant was gone three or four months, and Moore has never been seen since he fled. It was not customary to pen sows and pigs at the season of the year during which this theft was committed. The stock and fence law was not in operation in the witness's neighborhood.

Cross-examined, the witness stated that the nine hogs described belonged to him, and were not estray animals. He had never posted notices that they were estrays, and he never told Mr. Lancaster nor any one else that they were estrays. Witness got the ancestor of these hogs from William Smith in the following transaction: During the winter of 1882–1883 the witness was much annoyed by the incursions upon his property of a bunch of nine predatory hogs. He posted a notice at Youngsport, describing the animals and notifying the owner to remove them. Within a few weeks Smith, who then lived in Williamson county, having removed thither from the witness's neighborhood, came to see the witness about the hogs, claimed them, and proposed to the witness to keep and sell them for him, taking one in payment for his trouble. Witness accordingly sold eight of those animals, and, as his commission, retained, with Smith's consent, a fine sow, the one found in defendant's pasture, which is the mother of the other hogs lost by the witness. She was big with her litter when witness got her, and therefore he is unable to state the proportion of Poland-China and Guinea there is in the several hogs, but they were all fine animals, and not common razor-backs. All of the hogs described by the witness were missed at the same time, and were found on the same day, seven together and one alone. They all ran together in one bunch before they were taken, and came up together every day or two to be fed. William Smith, from whom witness obtained the parent sow, lived about twelve miles distant from witness, near Flor-

ence, in Williamson county. Witness saw him two days before this trial. The defendant's hog pen is situated within sixty-yards of a spring, which is a general watering-place for stock, and near his house. Witness did not tell Lancaster that one of the hogs he recovered from the defendant and Moore was an estray, and that he had or was going to kill it because it was in the habit of breaking into his pen. He did not tell Lancaster that he was being much annoyed by an estray hog.

F. A. Asherbrarner testified, for the State, that he lived with M. C. Parker, in March, 1884, and knew his hogs, and remembered when he missed nine head of hogs. Witness was with Parker when he found his animals. Seven head, which the witness recognized as Parker's hogs, were found in the defendant's pen. Among them was a black and white spotted sow, five pigs, and a black Poland-China boar. The boar was unmarked when lost, but both he and the sow were freshly marked in the defendant's mark when found. Witness was well acquainted with the market value of hogs at that time. The sow and pigs found in defendant's pen were worth at least $10. The boar was worth $8. He was a good stock hog. Another of Mr. Parker's sows, freshly marked, was found in A. J. Moore's pen. When lost, she was in Parker's mark, which the fresh mark did not entirely obliterate. The market value of this sow was $6. Another of Parker's sows was lost with this bunch, and was not found at all. She was very fat and would have weighed two hundred pounds, and as pork was selling then at six cents, would have netted at least $12 in value. Witness and Parker did not see either defendant or Moore when they found the hogs.

On the next morning the witness went with Mr. Parker and the constable when they took possession of the hogs. They found defendant and Moore at old man Moore's house. Defendant claimed to own the sow and five pigs. He said they had been running on the range unmarked, and that he got them up and marked them. He admitted that he marked the boar, but said that he did not claim that animal. But four of the five pigs found in the defendant's pen with the sow were her progeny. The other was the pig of the sow found in Moore's pen, and when it caught sight of the sow it ran to her, sucked her, and has followed her ever since. Defendant's and Moore's pens are near together — not over a mile apart.

W. J. Cathay testified, for the State, that in March, 1884, he was constable of precinct number eight, Bell county, Texas. During that month warrants for the arrest of the defendant and A. J.

Moore were placed in his hands on the charge of stealing Parker's hogs. He had also a search warrant to discover one spotted sandy colored sow, one spotted. sow with one pig, one spotted sow with four pigs, and one black boar. Witness found the sow with four pigs, an odd pig and the black boar in the defendant's pen. In Moore's pen he found a sow which, from appearances, had suckled one pig. Witness took possession of the hogs, and on turning them together the odd pig taken from defendant's pen ran to the sow taken from Moore's pen and sucked. Witness failed to find the sandy colored sow. Upon a search of Moore's house the witness found in a large box a freshly killed and salted hog of large size. Witness examined the premises, but could not find the place of butchery, nor could he find the head or ears of the animal killed. After taking possession of the hogs, witness went on to the house of old man Moore, where he found the defendant and A. J. Moore. Defendant claimed the sow and five pigs as his, and made the statement concerning them and the boar, as testified to by Parker. Witness then asked Moore about the sow found in his pen. He made no explanation whatever. He refused likewise to say anything about the fresh meat. Witness then asked Moore where he killed the hog, and he replied: "In the right place." Witness then arrested both the defendant and Moore, and placed them under bond to appear before the justice's court, to sit as an examining court.

Acting upon information he received, the witness looked for the defendant and Moore on the evening before the day set for their examining trial, and discovered that they had fled. Witness rode all night in pursuit of them, hearing of them last at Kempner, in Lampasas county. Defendant returned after an absence of three or four months, but Moore never did come back. The bonds of the two parties were forfeited when the examining court convened. The market value of the sow and pigs and boar found in the defendant's pen was at least $16, and the sow found in Moore's pen was worth at least $6. The meat found in Moore's house was worth about $12, there being about two hundred pounds of it, and it being worth at that time at least six cents per pound. On the trial of the right of property to the hogs, Parker recovered them. The defendant and Moore made no adverse claim to them. The marks of the hogs found in the defendant's pen were fresh. The State closed.

John A. Ray was the first witness for the defense. He testified that he went to the house of the defendant in the spring of 1883, to buy some hogs of the defendant. Defendant showed him a drove

of unmarked shoats running about his place that would be about ten or eleven months old in March, 1884. These animals were black and white spotted in color. Witness did not know what hogs the defendant had in his pens when they were visited by Parker and the officer. Witness never saw those hogs to his knowledge, and did not know whether they were marked or unmarked when the defendant penned them. Witness could not say that he was familiar with the market value of hogs, but supposed that an ordinary sow with five pigs was worth about $9. In the opinion of the witness such a boar as the one described was worth about $5, and a sow such as the one found in Moore's pen is described to be, about $4.

J. W. Lancaster was the next witness for the defense. He testified that he went to the defendant's house in the fall of 1883, to purchase some hogs. He saw a number of black and white spotted unmarked shoats running on the range near the defendant's house. These shoats would have been ten or twelve months old in March, 1884. Witness did not see the hogs Parker found in the defendant's pen. Witness had a conversation with Parker after he recovered the hogs in question, during the course of which he asked Parker why he had not marked his hogs to prevent some one from taking them as they did the unmarked stray hog he, Parker, had lost. Witness then asked him what became of the hog he found in Moore's pen. He replied that he had killed and eaten part of it; that he did not intend to allow another man's hog to eat his crop. He did not claim to own that sow. The sow and pigs found by Parker in the defendant's pen were worth about $6, and the boar about three or four dollars. The defendant's pen, in which the hogs were found, was near a neighborhood school and church house, and very near a spring which was a noted stock-watering place.

G. B. Reynolds, the defendant's father, testified in his behalf that he knew the defendant to own hogs on the range that, in color and appearance, correspond with those claimed by Parker. A few days before Parker claimed the hogs in question, witness, who lived in Kempner, Lampasas county, visited his son, the defendant, and saw an unmarked sow and five pigs in his pen that he claimed to own. Witness did not know of his own knowledge that those were the same hogs claimed by Parker. Defendant and Moore forfeited their appearance bonds in Bell county, but the witness did not know that they passed through Kempner together. Defendant returned voluntarily to Bell county after the adjournment of the district court, and gave a new bond. Witness had no knowledge of Moore's where-

abouts. The sow and pigs witness saw in the defendant's pen were worth about $6, and the boar was worth $3 or $4.

The charge of the court, the sufficiency of the evidence and the validity of the verdict were assailed in the defendant's motion for a new trial.

*Boyd & Holman*, for the appellant. The trial court in the charge to the jury charged not only on the weight of evidence, but informed the jury on what the State relied, in order to convict the defendant.

Why should the trial judge inform the jury that the State was expecting at their hands a verdict of guilty on circumstantial evidence? In the case of *Stuckey* v. *The State*, 7 Texas Court of Appeals, 178, Judge Clark says: "The spirit of the law requires of the judge to avoid *even* the appearance of an intimation as to the facts, and to so guard the language of his charge that no inference, however remote or obscure, may be drawn by the jury as to the facts in evidence from the charge as given them, which is made the law of the case."

After this charge, it was natural for the jury in their deliberations to say, that the court says we are to find our verdict on circumstantial evidence, as we are told that the State relies for a conviction on that ground, and, as the court is so fully impressed with that idea, he must be convinced that there is sufficient circumstantial evidence to convict the defendant, that it is our duty to do, as the court understands these matters better than we do.

Again, the court charged the jury on the law of principals. It is true appellant and Moore were jointly indicted as principals, acting together, but there was no proof that appellant and Moore acted together, were together, before or at the time of the alleged theft. This charge would not have been applicable, unless there had been some proof of their acting together at some time prior to and up to the time of the alleged theft.

After the court had charged the jury on the expectation of the State for a conviction on circumstantial evidence, it failed to give a charge in accordance with the rule laid down in the case of *Hampton* v. *The State*, 1 Texas Court of Appeals, 652, and adopted in the case of *Rodriquez* v. *The State*, 5 Texas Court of Appeals, 262, which is: " In order to warrant a conviction on circumstantial evidence, each fact necessary to the conclusion sought to be established must be proved beyond a reasonable doubt. All the facts must be consistent with each other and with the main fact." Was there any proof that appellant and Moore acted together at any time before,

or at the time the alleged theft took place? There is no proof to this effect, and the rule laid down in the case of *Walker* v. *The State*, 14 Texas Court of Appeals, 609, should be adopted in this case. In which the court says: "This court will not hesitate to set aside such a verdict when it appears that it is wrong, and it is clear that injustice has been done the defendant."

Did the parties act together? Were they guilty of the theft of hogs? Did appellant and Moore act together at the time of the commission of the offense? In the case of *Welsh* v. *The State*, 3 Texas Court of Appeals, 419, the court say: "So that in determining the question whether one accused of crime is liable as a principal offender, the inquiry is not as to what occurred *prior* to the commission of the given offense, or subsequently thereto; *but*, did the parties act together? Were the parties guilty of acting together in the commission of the crime or offense charged? Did the person or persons involved in the investigation *act together* with others in the commission of the offense?"

Again the court say: "Did the parties act together in the commission of the given offense? Was the act committed in pursuance of a common intent? Was the particular crime committed in pursuance of a previously formed design in which the minds of all united and concurred?"

Now, what proof was there that appellant had any connection with Moore in the taking of the hogs? If not, then the hogs appellant had in his pen, claiming them as his own, were not of the value of $20, or over, even if they had been stolen, which we deny.

In the case above cited, the court lays down this rule: "To hold a person liable, *there must* be a combination of act and intent in order to constitute crime."

"No amount of intent alone is sufficient; neither is any amount of act alone sufficient. The two must combine."

Again the court say: "To hold a person liable, there must be a combination of act and intent in order to constitute crime. No amount of intent alone is sufficient; neither is any amount of act alone sufficient. The two must combine."

The defense proved by all the witnesses, both for the State and defense, that appellant claimed the hogs in his pen — that is the sow and five pigs, not the boar — as his own property.

This claim was made openly, fairly and at all times. And when called on by the prosecuting witness he claimed the hogs as his property. He said they were his property; that he had put them in the pen, had marked them, and that they were in his possession,

in a pen in a public place, on a public road, near a public spring and church, and no attempt was made at concealment.

The next proposition is as to the claim of appellant to the hogs in controversy.

Appellant openly claimed the hogs — five in number — of the value of $10; the boar he did not claim, though the proof was by the prosecution that he had marked the boar, but not as his own property.

In the case of *Johnson* v. *The State*, 41 Texas, 608, the court say: "When property alleged to have been stolen was taken under a claim of ownership, it must appear from the evidence in order to convict, 1st, that the property taken did not belong to the accused; 2d, that he did not believe it to be his own when he took it, and 3d, that it was fraudulently taken. (*Smith* v. *The State*, 42 Texas, 444; *Billard* v. *The State*, 30 Texas, 367; *Mullens* v. *The State*, 37 Texas, 337; *Stuckey* v. *The State*, 7 Texas Ct. App., 176.)

There was no fraudulent intent at the time of the taking, as it was a notorious fact that appellant claimed the sow and five pigs all the time, and when the prosecuting witness called on him as to the ownership of the hogs he claimed them as his own property. (*Reed* v. *The State*, 8 Texas Ct. App., 40.)

There was no appropriation of the hogs. The hogs were in the pen openly and in a public place, which would be only considered in law a temporary use. (*Berry* v. *The State*, 2 Texas Ct. App., 148.)

We complain of the action of the prosecuting officer, who has every advantage in his closing argument to say a great many hard things about a man on trial, who is not allowed by the terms of the law to respond. And when he goes out of the record and makes assertions for proof, in order to induce a body of twelve men who have been selected indiscriminately from the great mass of the people, to do as he asks and advises them, they are governed in their actions by the representations of the prosecuting officer, and find their verdict according as they are directed. And if, unfortunately, the trial judge and the prosecuting officer lean toward the State in the trial of a cause, as is often the case, it is unfortunate for the State and terrible on the defendant, and his only redress is to the courts, who, being far removed from the *locus in quo*, are not biased, and can render unto "Cæsar the things that are Cæsar's, and unto God the things that are God's."

The attention of the court was called to the remarks made by the prosecuting officer at the time, and a gentle reprimand by the court

will not efface the recollection of the jury in their retirement. Re-
marks of this kind should not be indulged in by a prosecuting officer,
and if indulged in should *always* be promptly rebuked by the ap-
pellate court.

It is gross injustice to take advantage of a man when he is not
allowed to reply with facts and argument, and to influence a body
of men who are in the hands of the State, and who rely on the
statements made and being made by the law officer, and who gener-
ally find their verdict accordingly.

This court has rebuked some of the finest prosecutors in the State,
for going beyond and out of the record in order to secure a convic-
tion, and by a reversal have repaired, as far as in their power, the
wrong done in the trial court to an unfortunate defendant. (*Hatch*
v. *The State*, 8 Texas Ct. App., 416; *House* v. *The State*, 9 Texas
Ct. App., 567; *Coon* v. *The State*, 11 Texas Ct. App., 592; *Morales*
v. *The State*, 1 Texas Ct. App., 494; *Lester* v. *The State*, 2 Texas
Ct. App., 432.)

Now, the verdict. What is it? Counsel for the appellant moved
the trial court to send up to the Court of Appeals the original in-
dictment, on which was written the verdict of the jury. As the
district clerk has entered the same in the record, according to his
*translation* of the same, it does violence not only to Webster and
Walker, but to Josh Billings.

Fortunately, the original is before the court, thanks to the kind-
ness of the Hon. B. W. Rimes, who permitted it to go up in the
record. We are always willing to accord honor to whom honor is
due, and at the same time thankful for small favors.

The court will find by the construction of the English language
with the use of the caret, which, says Mr. Webster, "shows that
something omitted in the line is interlined above or inserted in the
margin, and should be read in that place."

And we ask the court to read the verdict according to the proper
construction of the English language, as nothing can be taken by
intendment in a criminal case. (*Webb* v. *The State*, 41 Texas, 72;
*State* v. *Daugherty*, 26 Texas, 111; *State* v. *Houston*, 12 Texas, 245;
*Moore* v. *The State*, 7 Texas Ct. App., 608; *Smith* v. *The State*, 1
Texas Ct. App., 626.)

The verdict reads as follows: "We, the jury, find the defendant
of theft of hogs over the value of $20, as charged in guilty indict-
ment, and assess his punishment at confinement for two years in the
*pemtemeary*."

Is that an intelligible verdict? In the case of *Wooldridge* v. *The*

*State,* 13 Texas Ct. App., 443, the court said that *fist* was not *idem sonans* with first. So, in this case, it is neither good nor bad English — it is not *idem sonans* with anything. And no one but the jury could comprehend what it was intended for. And courts of final resort cannot afford to conjecture what a jury intended to do or say, as only God Almighty can say what they, in this particular case, meant to say or do.

It is unfortunate, yet it cannot be helped, unless the Court of Appeals, in its great magnanimity and deference for the frailty of humanity, says we will assist you by interpreting your verdict into good English.

*J. H. Burts,* Assistant Attorney General, for the State.

WILLSON, JUDGE. At our last term at Tyler the judgment of conviction in this case was affirmed without a written opinion. The case was at that time argued orally by counsel for appellant, and an able printed brief was also filed by said counsel in the case. We carefully read the record in the case, and considered each and all of the propositions presented in the brief of counsel, and elaborated in his oral argument. In this motion for rehearing, counsel for appellant insists that we erred in affirming the judgment, and suggests that this error is attributable to too hasty an examination of the case. Nothing is presented and discussed in this motion that was not fully presented, discussed and considered before the judgment of affirmance. We have again carefully examined the record, and perceive no error for which the conviction should be set aside. To satisfy counsel for appellant that we have examined the record, and know what it contains, we will discuss each of the matters complained of in his brief, *seriatim.*

I. It is complained that the court, in its charge, used the following language: "You are further charged that the State, in this case, relies upon circumstantial evidence to establish the alleged fact that defendant and said A. J. Moore acted together as principals in the alleged taking of said hogs," etc. It is objected to this language that it is a charge upon the weight of evidence. We cannot so regard it. It is but the statement of an uncontroverted fact, introductory merely to the instruction which followed as to the requisite cogency of circumstantial evidence to authorize a finding against the defendant. It was a statement favorable to the defendant, and of which he cannot, therefore, be heard to complain. (*Jenkins* v. *The State,* 1 Texas Ct. App., 346; *Darnell* v. *The State,* 43 Texas,

147.) As in fact the evidence against the defendant upon which the State relied to convict him of the felony charged was wholly circumstantial, it was highly proper for the court to so instruct the jury. It is further to be remarked that this supposed error in the charge was not specifically excepted to by the defendant at the time of the trial, the exception being general that the entire charge of the court was upon the weight of the evidence.

II. It is next claimed by appellant's counsel that the charge upon circumstantial evidence is not as full and specific as it should have been. While this position may be correct, still, in the absence of any exceptions made at the time of the trial, and when no additional instruction upon this subject was requested by the defendant, we have no hesitation in holding that there is no such error in the charge as was calculated to prejudice the rights of the defendant.

III. It is strenuously urged by defendant's counsel that the evidence is insufficient to support the conviction. We think otherwise. We think the evidence in relation to one of the five pigs found in defendant's pen cogently connects the defendant and Moore together as principals in the theft of all the hogs, and well warranted the jury in finding that the hogs were all taken at the same time and place, by the defendant and said Moore, acting together in the commission of the theft. Apparently insignificant circumstances sometimes afford the most satisfactory evidence of guilt. The actions of the pig alluded to, impelled by the instincts of its nature, pointed to the guilty connection of the defendant and Moore with convincing force. But the testimony afforded by this pig is not the only circumstance supporting the verdict of the jury, as will be perceived by reference to the evidence which the reporter will publish with this opinion. As we view the evidence, there is no doubt in our minds that it is amply sufficient to justify the verdict, in all respects. And the charge of the court as to the law of principals was correct, and was demanded by the facts proved.

IV. As to the special instructions requested by the defendant and refused by the court, in so far as the same were correct and proper they were substantially embraced in the charge given to the jury, and it was not only unnecessary but would have been improper for the court to reiterate them. "It is not error to refuse a special instruction, the substance of which is already embraced in the general charge." (Clark's Cr. Law, p. 519, note 205.)

V. Appellant's next complaint is that the attorney for the State, in his closing argument to the jury, said, "This defendant and Moore, with whom he is charged as principal, stole the hogs and

divided them." We think this assertion was warranted by the evidence, and was strictly within the rules governing arguments.

VI. We do not think the objection to the verdict is well taken. The original verdict is before us, and we have had no difficulty in reading and understanding it. It is perfectly intelligible to us. It reads: "We, the jury, find the defendant guilty of theft of hogs over the value of $20, as charged, and assess his punishment for two years in the *pententiary.*" The last word is misspelled, the letter "i," constituting the second syllable, being omitted. This defect does not vitiate the verdict. Where the sense is clear, neither bad spelling nor bad grammar will vitiate a verdict. (*Taylor* v. *The State*, 5 Texas Ct. App., 569.) It is not a valid objection to the verdict that it omits to say "confinement in" the penitentiary. (*Jones* v. *The State*, 7 Texas Ct. App., 103.) We regard the objections made to the verdict as technical and without substantial merit, and such objections, in considering and determining its sufficiency, are to be disregarded. (*Lindsay* v. *The State*, 1 Texas Ct. App., 327.)

Believing that we committed no error in affirming the judgment in this case, the motion for rehearing is overruled.

*Ordered accordingly.*

[Opinion delivered January 17, 1885.]